An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-164

NORTH CAROLINA COURT OF APPEALS

Filed: 19 August 2014

IN THE MATTER OF:

C.E.C.B., S.M.B., E.M.G.B.                New Hanover County
                                          Nos. 10 JT 159-161


Appeal by respondents from order entered 21 November 2013 by Judge J.H. Corpening, II in New Hanover County District Court. Heard in the Court of Appeals 28 July 2014.


*Regina Floyd-Davis for petitioner-appellee New Hanover County Department of Social Services.*

*Manning, Fulton & Skinner, P.A., by Michael S. Harrell, for guardian ad litem.*

*Hunt Law Group, P.C., by James A. Hunt, for respondent-appellant mother.*

*Mark L. Hayes for respondent-appellant father.*


HUNTER, Robert C., Judge.


Respondent-mother and respondent-father ("respondents") appeal from an order terminating their parental rights to their

children, Cathy, Sally, and Emily.[1] After careful review, we affirm.

**Background**

On 24 May 2010, the New Hanover Department of Social Services ("DSS") filed a juvenile petition alleging that Cathy, age 7, Sally, age 2, and infant Emily (collectively "the children") were neglected and dependent. DSS also alleged that fourteen-year-old "Amy," respondent-mother's biological daughter and respondent-father's adopted daughter, was neglected and dependent.[2] By order filed 16 August 2010, the trial court adjudicated the children neglected based upon the parties' stipulation that respondents engaged in domestic violence.

In a November 2011 permanency planning review order, the trial court found that respondents had complied with their Family Services Agreement and returned the children to the legal custody of respondents. The trial court ordered respondents, who had separated, to continue to comply with prior court orders and to maintain appropriate housing and employment. Afterwards, the children mostly lived with respondent-father.

---

[1] Pseudonyms are used throughout this opinion to protect the identity of the children and for ease of reading.
[2] Amy is not a subject of this appeal because she reached the age of majority prior to the filing of the petition to terminate parental rights.

DSS filed a new petition on 12 March 2012 alleging that the children and Amy were neglected and dependent. By order filed 11 June 2012, the trial court adjudicated the children neglected and dependent based, in part, upon respondents' stipulation that respondent-mother allowed the children to be exposed to Mr. C., "with whom she is engaged in a domestic violence ridden relationship" and that respondent-father's home was not an "appropriate living arrangement due to [its] deplorable state." The trial court ceased reunification efforts with respondent-mother on 21 September 2012 based, in part, upon her continued relationship with Mr. C. in direct violation of a prior court order. The trial court ceased reunification efforts with respondent-father on 17 June 2013 after finding he "only recently obtained housing" that "appear[ed] to be appropriate for the children[.]"

DSS filed a petition to terminate respondents' parental rights on 19 July 2013. DSS alleged that the parental rights of respondents were subject to termination pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) (neglect) and N.C. Gen. Stat. § 7B-1111(a)(2) (failure to make reasonable progress). The termination of parental rights hearing began on 18 September 2013, after which the trial court found that both grounds

existed to terminate respondents' parental rights. The court also determined that termination of respondents' parental rights was in the best interest of the children and entered an order terminating respondents' rights. Respondents separately appeal.

**Standard of Review**

"The standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law. We then consider, based on the grounds found for termination, whether the trial court abused its discretion in finding termination to be in the best interest of the child." *In re Shepard*, 162 N.C. App. 215, 221-22, 591 S.E.2d 1, 6 (internal citation and quotation marks omitted).

**Arguments**

**I.  Grounds for Termination**

Respondents first contend the trial court erred in concluding that grounds existed to terminate their parental rights under N.C. Gen. Stat. § 7B-1111(a)(1). We disagree.

A trial court may terminate parental rights based on a finding that the parent has neglected the juvenile. N.C. Gen. Stat. § 7B-1111(a)(1) (2013). A neglected juvenile is one who

"does not receive proper care, supervision, or discipline" from a parent or caretaker, or "who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen. Stat. § 7B-101(15) (2013). Generally, "[a] finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." *In re Young*, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). However, "a prior adjudication of neglect may be admitted and considered by the trial court in ruling upon a later petition to terminate parental rights on the ground of neglect." *In re Ballard*, 311 N.C. 708, 713-14, 319 S.E.2d 227, 231 (1984). Where a prior adjudication of neglect is considered by the trial court, "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *Id.* at 715, 319 S.E.2d at 232. Thus, where

> there is no evidence of neglect at the time of the termination proceeding . . . parental rights may nonetheless be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to her parents.

*In re Reyes*, 136 N.C. App. 812, 815, 526 S.E.2d 499, 501 (2000). Respondents argue that the trial court's conclusion that neglect

is likely to be repeated is not supported by its findings of fact.

The trial court made the following relevant findings in support of its conclusion of law that grounds existed to terminate respondents' parental rights based on neglect:

> 5. That family living environment, while residing in [] Nevada, was marred with substance abuse by [respondent-father] and domestic violence between [respondents]. [Amy] testified that the family had involvement with the Washoe County Department of Social Services in [] Nevada. [Amy] described their living environment as marred with domestic violence, drug use, chaotic and fraught with financial problems. In, [sic] 1999, [respondent-father] was incarcerated for three years for possession of illegal substances. [Respondent-father] acknowledges the involvement of the Washoe County Department of Social Services on only one occasion.
>
> 6. That the domestic violence continued when the parties moved to [] North Carolina. On May 22, 2010, [DSS] assumed legal custody of [Amy, Cathy, Sally, and Emily] due to an incident of domestic violence between [respondents]. Both parents were arrested, and there was no alternative placement arrangement for the children.
>
> . . . .
>
> 9. That from May 22, 2010 through October 27, 2011 [DSS] maintained legal custody of [Amy, Cathy, Sally and Emily]. The parents stipulated to the neglect allegations contained in the Juvenile Petition filed on May 22, 2010. [Cathy and Sally] were placed

with [respondent-father]. [Emily], as an infant, was placed with [respondent-mother], who was breastfeeding at the time. [Amy] remained in foster care until she requested to be placed with her siblings in her father's home, which was done on September 20, 2010. Following an incident with her father, [Amy] was again placed in a group home on May 18, 2011. In February of 2011, [respondent-mother] had to undergo emergency surgery, and [Emily] was moved to [respondent-father's] home with her siblings. During the period of time from May 2010 to October 27, 2011, [DSS] made reasonable efforts with each parent. [Amy] described life after the parents' separation as showing "no improvement." The same problems existed with each parent, just involved other people.

10. That [respondents] successfully completed the Domestic Violence Program, and initiated couples counseling between May and October of 2011. . . . That legal custody of [Cathy, Sally, and Emily] was restored to [respondents] in October 2011. [Respondent-father] exercised primary custody, with [respondent-mother] exercising secondary custody. Subsequently, [respondent-mother] reported to a Social Worker at [DSS] regarding [respondent-father's] care of the children. She complained that [respondent-father's] house was unclean, and the children were being neglected and abused. She complained that [Cathy] was not going to school, and [Amy] had to babysit the younger children. She complained that [respondent-father] was verbally and physically abusive to the children over small things. [Respondent-mother] personally observed the house to be unclean, and in disarray. [Respondent-mother] personally observed the children with poor hygiene. [Amy] testified that her younger siblings were not being

bathed, and did not have adequate food.

11. That in January of 2012, [DSS] received reports alleging neglect of [Cathy, Sally, and Emily] due to [respondent-father's] dirty home and care of the children. This Court finds the testimony regarding the children's living environment while in the physical custody of [respondent-father] to be credible. The children were not being properly cared for by [respondent-father]. [Respondent-father's] home had deteriorated to deplorable conditions. [Cathy] had numerous tardies and absences from school. [Cathy, Sally, and Emily] did not appear properly groomed. [Cathy, Sally, and Emily] were subsequently placed in the physical custody of [respondent-mother] pursuant to a Safety Assessment, while [DSS] conducted an investigation of the recent allegations. [Amy] remained in the legal custody of [DSS]. [Respondent-mother] testified that when [Cathy, Sally, and Emily] returned to her physical custody in January of 2012, they would wake up screaming, and hoarded food in drawers, toys and purses. She had never previously observed such actions from her children.

12. That [respondent-mother] filed for [a] Domestic Violence Protective Order against [respondent-father] in January of 2012, which was subsequently dismissed. In March of 2012, [respondent-mother] again filed for a Domestic Violence Protective Order against [respondent-father] alleging fear of further violence, threats of harm from him, and a threat to kill her. She was granted the Domestic Violence Protective Order on March 23, 2012, which remained in effect until March 24, 2013.

13. That [DSS] subsequently learned that [respondent-mother] had allowed [Cathy,

Sally and Emily] to be cared for by [Mr. C.] for a three day period, when she did not have housing due to a miscommunication relative to moving into a new residence. [Emily] sustained bruises on her buttocks during said period. [DSS] filed a Petition alleging [Cathy, Sally and Emily] to be neglected Juveniles on March 12, 2012, and assumed legal custody of said children on the same date.

14. That in March of 2012, [respondent-mother] filed for a No-Contact Order against [Mr. C.], which was granted by the Court.

15. That at a hearing held on May 17, 2012, the parties stipulated to the allegations of neglect and dependency, to wit: [Neglect] Despite warning from the petitioner . . . to avoid contact of the children with [Mr. C.] in a current Safety Assessment, and a prohibition in prior Court Orders, the mother has been cohabiting with [Mr. C.] for at least the last three days and allowed him to inappropriately discipline [Emily], leaving bruising on her buttocks area. She has engaged in domestic violence in the presence of the children with [Mr. C.] and has a history of domestic violence in her relationship with the father of the children. . . . [Dependency] The mother allowed the children to be exposed to [Mr. C.], with whom she is engaged in a domestic violence ridden relationship. The father's home was not an appropriate living arrangement due to its deplorable state. There are no relatives in this state to provide care for the children.

16. That [DSS] made reasonable efforts with [respondent-mother] from March of 2012 until August 29, 2012. [Respondent-mother] was directed to comply with the terms of her Family Services Agreement. She was directed

to participate in individual and family therapy, maintain a support system, maintain housing and be financially responsible for her rent and utilities. [Mr. C.] was prohibited from contact with the children.

17. That [Amy] was placed in a trial home placement with her mother in June of 2012. Subsequent to said placement, [respondent-mother] maintained a relationship with [Mr. C.]. [Amy] observed [Mr. C.] in her mother's home with her mother's consent on more than one occasion. That in July of 2012, [Amy] and her mother engaged in a physical altercation, wherein [Mr. C.] was present. [Amy] sustained a black eye [] and [respondent-mother] was bitten on the finger, and presented with bruises about her body. [Respondent-mother] was charged with misdemeanor child abuse; however, the charges were dismissed. [Amy] was not informed of the Court Date, and did not have transportation to testify in District Court regarding the incident; hence, the charges were dismissed by the state. [Respondent-mother] denies that [Mr. C.] was ever at her residence. Efforts toward reunification with [respondent-mother] were ceased [] at the hearing on August 29, 2012 with a finding that such efforts would be futile and inconsistent with the Juveniles' permanent home within a reasonable period of time. . . .

. . . .

19. That [respondent-mother] has consistently maintained that she is not in a relationship with [Mr. C.]. She has testified before this Court, that she has had no contact with [Mr. C.] since February of 2012. She has testified that [Mr. C.] has stalked her.

20.    That on July 9, 2013, [respondent-mother] filed for a Complaint for No-Contact Order for Stalking or Nonconsensual Sexual Conduct against [Mr. C.]; however, said request was dismissed as [respondent-mother] did not attend the hearing, citing her work obligations.    On July 20, 2013, [respondent-mother] filed for a Complaint for No-Contact Order for Stalking or Nonconsensual Sexual Conduct against [Mr. C.]; the Order was entered on the same date and effective for one year thereafter.

21. That [Mr. C.] denies that he has maintained a relationship with [respondent-mother], denies that [respondent-mother] consented to any visits to her home, and denies having sexual relations with [respondent-mother], as testified to by his daughter, [M.C.].  On the same day of the Court hearing wherein efforts towards reunification were ceased with [respondent-mother], on August 29, 2012, she was observed with [Mr. C.].  [Respondent-mother] indicates that she observed him walking down the street, and pulled her car over to talk to him.  When questioned during testimony about this incident, [Mr. C.] pled the Fifth Amendment Right against Incrimination indicating his knowledge of the existence of a No-Contact Order between the parties. This Court finds that [Mr. C.'s] testimony is not credible.

22.    That [respondent-mother] attended a basketball game with [Mr. C.] in December of 2012.    She had testified that she was working on the date in question; however, [Ms. B.], his ex-significant other, and his daughter,[M.C.], saw [respondent-mother] at the game.  In fact, her attendance at the game caused much consternation to the child. Additionally,    [respondent-mother]    has provided [Mr. C.] transportation to serve

his weekends in jail. [M.C.] has heard [respondent-mother] and [Mr. C.] engaging in sexual intercourse at his home on the weekends. This Court finds the testimony of [Ms. B.] and [M.C.] to be very credible.

23. During this hearing on termination of parental rights, she has reiterated that she has not maintained a relationship with [Mr. C.]. She is not credible in her assertions to this Court regarding her relationship with [Mr. C.].

24. That [respondent-mother] has engaged [in and] been involved in abusive relationships with [name omitted], [Amy's] biological father, [respondent father], [Cathy, Sally, and Emily's] biological father and [Mr. C.], her significant other.

25. That at the hearing held on August 29, 2012, [respondent-father] was ordered to comply with his Family Services Agreement. He was directed to complete a parenting class, follow all recommendation[s] and demonstrate that he can effectively discipline and maintain a clean home. He was directed to actively participate in individual therapy. He was directed to obtain and maintain stable housing, and in a timely manner, be responsible for payment of his rent and utilities.

26. That [respondent-father] began therapy in August of 2012, and maintained therapy until the plan of reunification for him was changed. [Cathy, Sally, and Emily] have been in foster care since May of 2012. [Respondent-father] did not obtain housing until February of 2013. He resided with various friends until he subsequently obtained a room at the TravelLodge Motel, initially in exchange for work at the motel. Subsequently, he became an employee of the

hotel and rented a room. This housing, nor his previous housing arrangements, was not appropriate for placement of the three girls. Five months prior to the filing of the Petition to terminate his parental rights, [respondent-father] rented a two bedroom mobile home, which appears to be clean. He has maintained said housing. He has completed a parenting class. He has maintained employment since December of 2012, working 60 to 80 hours per week, and is current in his child support. He recently purchased a vehicle from his friend [name omitted]. Prior to this, [DSS] had assisted [respondent-father] by providing bus passes transportation vouchers of bus passes on two occasions. [Respondent-father] has maintained visitation with his children, and said visitations have gone well, and been appropriate.

27. That [Amy] noted the difficulties that [respondent-father] had in providing appropriate care for herself and her siblings, when residing in Nevada and North Carolina. [Respondent-mother] noted the difficulties that [respondent-father] had in providing appropriate care for [Cathy, Sally, and Emily] when providing care for [Cathy, Sally, and Emily]. The children were placed in his primary care after the hearing held on October 27, 2011, and five (5) months later, they were removed due to [a] filthy living environment in which he had allowed his residence to deteriorate. There were numerous tardies and absences of [Cathy] from school, which were attributed to [respondents]. [Respondent-father] was not able to maintain his residence subsequent to the children's removal.

. . . .

29. That [respondent-father] attributes the

> removal of the children from his home to [respondent-mother]. He testified that [respondent-mother] wanted primary custody of the children, and when he refused her request, she threatened that he was "going down." [Respondent-father] testified that he worries that [respondent-mother] would make further allegations against him if the children were ever returned to him.

Respondents do not challenge the above findings of fact, and they are therefore binding on appeal. *See In re Humphrey*, 156 N.C. App. 533, 540, 577 S.E.2d 421, 426 (2003) ("Findings of fact to which a respondent did not object are conclusive on appeal.").

Respondent-father argues that because he satisfied his case plan, he addressed conditions which led to the removal of his children, and, therefore, there is no likelihood of future neglect. The trial court's findings of fact demonstrate that respondent-father exposed the children to domestic violence and substance abuse; that three months after the children were returned to respondents' legal custody, respondent-father was unable to provide for the children's physical and economic needs; that respondent-father had to rely upon friends for temporary housing for himself; and respondent-father did not obtain housing appropriate for his three daughters until February 2013. Further, although the children were removed from

respondent-father's home due to its deplorable conditions, respondent-father blames respondent-mother for the children's removal. These findings support the trial court's determination that respondent-father has neglected his children and that there is a reasonable probability that the children will be neglected if respondent-father is responsible for the children's care in the future. The trial court did not err by concluding that respondent-father's parental rights were subject to termination for neglect.

Respondent-mother argues that since there was no evidence that she "was in any relationship at all at the time of the termination hearing, or even since the filing of the petition[,"] there was no risk of repetition of domestic violence and thus neglect of her children.

We hold that the trial court's findings of fact support its conclusion of law that respondent-mother neglected her children and that such neglect will likely be repeated should her children be returned to her care. A trial court's determination that neglect is likely in the future "must of necessity be predictive in nature[."] *In re McLean*, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999). Respondent-mother's past actions and poor decisions are important indicators of the likelihood of

repetition of neglect. Respondent-mother's repeated failure to stop the cycle of violent incidents involving the fathers of her children and Mr. C., which continued after the petition was filed, was sufficient to show neglect would likely recur if the children were returned to respondent-mother's care.

We, therefore, hold that the trial court did not err in determining that the ground of neglect existed with respect to respondent-mother and respondent-father. Our determination that there is at least one ground to support a conclusion that parental rights should be terminated makes it unnecessary to address the remaining grounds. *In re Clark*, 159 N.C. App. 75, 84, 582 S.E.2d 657, 663 (2003).

## II. Best Interest

Respondent-mother also contends the trial court abused its discretion in concluding that the termination of her parental rights was in the best interest of her children.

In determining whether terminating the parent's rights is in the juvenile's best interest, the court shall consider the following criteria and make written findings regarding the following that are relevant:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.

(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.

(4) The bond between the juvenile and the parent.

(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6) Any relevant consideration.

N.C. Gen. Stat. § 7B-1110 (2013). The court's decision is discretionary and reviewable only for abuse of discretion. *In re Anderson*, 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002). "A ruling committed to a trial court's discretion is to be accorded great deference and will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

Here, the trial court made the following findings of fact to support its conclusion that it is in the best interest of the children that respondent-mother's rights be terminated:

35. That [Cathy] is ten years old, [Sally] is five years old, and [Emily] is three years old. The Juveniles have been in the legal custody of [DSS] most recently since 12 March 2012. They were previously placed in the legal custody of [DSS] from May 22, 2010 through October 27, 2011, having been

adjudicated neglected and dependent Juveniles. They are young children and there is a strong likelihood of adoption. Termination of parental rights will aid in the accomplishment of the permanent plan for the Juveniles.

36. That [Sally] and [Emily] are placed together in a pre-adoptive home . They are very bonded to their foster parents. [Sally] needs and has a structured environment. They refer to the foster parents as "mommy" and "daddy."

37. That [Cathy] is not in a pre-adoptive home; however, [DSS] has identified a pre-adoptive home for her. [Cathy] was previously placed in said home, and has a bond with the previous foster parent. [Cathy] appears to be a happy child, and makes friends easily. She has asked her 18 year old daycare teacher to adopt her. She has asked the Guardian ad Litem to adopt her. She has asked the nephew and wife of her current foster parents to adopt her. [Cathy] has articulated that she would prefer to live with her mother, as "Dad cannot care for them."

38. There is a strong bond between the children and their parents. It is clear that the children love their parents, and that the parents love the children.

39. That it is in the best interests of [Cathy, Sally, and Emily] that the parental rights of [respondent-mother] and [respondent-father] be terminated.

Respondent-mother does not challenge the above findings of fact.

She argues that because she made progress on her plan, the trial

court should not have terminated her rights.  As these findings reflect a reasoned decision, we find no abuse of discretion.

## Conclusion

Based on the foregoing, we affirm the trial court's order terminating the parental rights of respondent-mother and respondent-father.

AFFIRMED.

Judges DILLON and DAVIS concur.

Report per Rule 30(e).